**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DANIELLE G.,**

                  **Plaintiff,**

**v.**                                            **5:17-CV-01116 (NAM)**

**NANCY A. BERRYHILL, Acting Commissioner**
**of Social Security,**

                  **Defendant.**
_____

**Appearances:**

Plaintiff *Pro Se*
Danielle G.

Counsel for Defendant:
Grant C. Jaquith, United States Attorney
Kristina Cohn, Special Assistant U.S. Attorney
Social Security Administration
Office of General Counsel
26 Federal Plaza, Room 3904
New York, New York 10278

**Hon. Norman A. Mordue, Senior United States District Court Judge**

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

Plaintiff Danielle G. filed this action under 42 U.S.C. §§ 405(g) and 1383(c)(3)

challenging the denial of Plaintiff's application for Supplemental Security Income ("SSI") under

the Social Security Act ("the Act"). (Dkt. No. 1). The parties' briefs, filed in accordance with

N.D.N.Y. General Order 18 are presently before the Court. (Dkt. Nos. 15, 19). After carefully

reviewing the Administrative Record (Dkt. No. 10), and considering the parties' arguments, the

Court affirms the Acting Commissioner's decision that Plaintiff was not disabled under Section 1614(a)(3)(A) of the Act.

## II.     BACKGROUND

### A.  Procedural History

Plaintiff initially applied for disability benefits on October 22, 2013, alleging that she had been disabled since January 1, 2003[1] due to lower back pain, chronic pain, fibromyalgia, chronic migraines, degenerative disc disease in lumbar spine, a learning disability, irritable bowel syndrome ("IBS"), bad teeth, insomnia, and sciatica.  (Dkt. No. 15; R. 341–51, 374).  The Social Security Administration denied Plaintiff's initial SSI application on April 18, 2014.  (R. 241–44).  On May 14, 2014, Plaintiff appealed that determination and requested a hearing by an ALJ.  (R. 245–47).  The hearing was held on December 16, 2015 before ALJ Elizabeth Koennecke; Plaintiff testified and was represented by counsel at the hearing.  (R. 28–49, 245–47).  On April 26, 2016, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act.  (R. 10–21).  Plaintiff then filed a request for a review of that decision with the Appeals Council, which subsequently denied review on April 20, 2017.  (R. 1–3).

Plaintiff commenced this action on October 6, 2017.  (Dkt. No. 1).

### B.  Plaintiff's Background and Testimony

Plaintiff was born in 1976.  (R. 488).  She is a high school graduate but received generally poor grades in her regular education courses.  (*Id.*).  After high school, Plaintiff briefly attended Bryant and Stratton College and another on-line degree program but did not complete

---

[1]  Plaintiff amended her disability onset date to October 22, 2013 at her hearing before the ALJ on December 16, 2015.  (R. 33).

either program. (*Id.*). From 1996 through 2003, Plaintiff worked part-time at a bowling alley, as a cashier, and as a fast food worker. (R. 376). Plaintiff stopped working because of her medical conditions in January 2003 and has not been employed since. (R. 374).

At her administrative hearing on December 16, 2015, Plaintiff testified that she lived with her mother and her two children, ages 13 and 16. (R. 35). At that time, Plaintiff's mother had custody of Plaintiff's children. (R. 30). Plaintiff stated that she suffered from chronic back pain and back spasms which prevented her from performing regular self-care and household chores. (R. 36–37, 40). She testified that she was unable to cook or clean. (R. 36, 40). Plaintiff reported that her mother and boyfriend prepared her meals. (R. 396–97). She stated that she did dishes and laundry if someone was able to carry it for her. (R. 397). Plaintiff reported that she was able to manage her own finances and that her ability to handle her money had not changed since her conditions began. (R. 398).

She stated that she had diarrhea after she ate requiring her to be in the bathroom for 30 minutes each time. (R. 40). She reported that "walking more than a mile a day, standing more than 15, 20 minutes at a time, sitting for about 15, 20 minutes" would increase the severity of her pain. (R. 38). Plaintiff also described experiencing daily migraines and insomnia. (R. 42). She reported taking a shower once a week, which required her boyfriend's assistance because she has poor balance. (R. 43).

### C. Medical Evidence of Physical Disability

#### 1. Dr. Michaels, Primary Care Physician

On June 20, 2012, Dr. John Michaels, Plaintiff's treating physician, stated that Plaintiff was "doing well" with "no acute concerns." (R. 471). On examination, Plaintiff had a normal abdominal examination and was neurologically intact with full muscle strength throughout. (R.

472). The doctor diagnosed insomnia and lumbago. (R. 472). Throughout her course of treatment, Dr. Michaels noted that Plaintiff saw a neurologist for her headaches, a hematologist for elevated white blood cell counts (WBC), a gastroenterologist for IBS, and a rheumatologist for fibromyalgia. (R. 464, 467, 469, 471).

On October 24, 2012, Plaintiff saw Dr. Michaels again; she denied any medical complaints and her physical examination remained unchanged from her prior visit. (R. 469, 470, 472).

On April 18, 2013, Dr. Michaels completed a Medical Source Statement on behalf of Plaintiff. (R. 462–63). The doctor checked-off that Plaintiff was very limited (able to perform one-to-two hours/day) in her ability to walk, stand, sit, push, pull, lift, carry, climb, and bend. (R. 463). He commented that Plaintiff could not use public transportation. (*Id*.). On the same day, Plaintiff told Dr. Michaels that she had increased abdominal pain. (R. 467). Plaintiff denied any other complaints and denied any change in bowel habits. (R. 467–68). The doctor advised Plaintiff to consult with her gastroenterologist. (R. 468). On examination, Plaintiff had a normal abdominal examination, full strength in the upper and lower extremities, and she was neurologically intact. (*Id*.). Dr. Michaels diagnosed Plaintiff with IBS, lower back pain, and anxiety. (R. 468).

At an October 3, 2013 visit, Plaintiff told Dr. Michaels that she fell off her bed and had back pain. (R. 464). She denied any other complaints. (*Id*.). On examination, Plaintiff had a normal abdominal examination, full strength in the upper and lower extremities, and she was neurologically intact. (R. 465). An October 3, 2013 x-ray of Plaintiff's lumbar spine showed "very mild disc space narrowing diffusely throughout the lumbar spine." (R. 466).

4

On April 7, 2014, Plaintiff saw Dr. Michaels for a medication management appointment of her contraceptives and migraine medication. (R. 505). Plaintiff told the doctor that she was feeling well and denied any problems/side effects with current medications. (*Id*.). She denied any chest pain, shortness of breath, or change in bowels. (*Id*.). The doctor noted that Plaintiff continued to see a neurologist for her headaches, a hematologist for elevated WBC counts, a gastroenterologist for IBS, and a rheumatologist for fibromyalgia. (*Id*.). On examination, Plaintiff had a normal abdominal examination, full strength throughout the extremities, and she was neurologically intact. (*Id*.). Dr. Michaels diagnosed "chronic migraine-w/o aura-w/ intractable migraine - w/ status migrainosus contraceptives." (R. 505).

At a June 9, 2014 visit, Plaintiff told Dr. Michaels that her migraines were about the same. (R. 507). She complained of right shoulder pain. (*Id*.). The doctor noted that Plaintiff's physical examination findings were unchanged from her prior visit. (R. 505, 507). The doctor diagnosed "chronic migraine-w/o aura-w/intractable migraine-w/status migrainosus," IBS, lower back pain, and anxiety. (R. 507). Dr. Michaels advised Plaintiff to see an orthopedist for her right shoulder pain, continue Treximet for migraines, and follow up with her gastroenterologist for IBS. (R. 508). He concluded that Plaintiff's back pain was stable. (*Id*.). On the same day, Dr. Michaels completed another Medical Source Statement for Plaintiff. (R. 540-41). He opined that Plaintiff was very limited in her ability to walk, stand, sit, lift, carry, push, pull, bend, climb stairs, and function in a work setting at a consistent pace. (R. 541). He also opined that Plaintiff was moderately limited in her ability to use hands, see, hear, speak, and maintain basic standards of personal hygiene. (*Id*.). The doctor further indicated that Plaintiff could understand, remember, and carry out instructions; maintain attention/concentration; make simple decisions; and interact appropriately with others. (*Id*.). Dr. Michaels reported that Plaintiff

could not take public transportation and could not sit for more than 15 to 20 minutes at a time. (*Id*.).

Plaintiff's June 2014 appointment was the last time she saw Dr. Michaels. (R. 39).

## 2. Dr. Lavelle, Orthopedist

On December 26, 2013, Plaintiff saw orthopedist Dr. William Lavelle for complaints of back pain. (R. 486). Dr. Lavelle reported that Plaintiff was in no acute distress, alert, and fully oriented. (*Id*.). Plaintiff was neurologically intact and had intact sensation, normal reflexes, a normal gait, and full muscle strength throughout. (*Id*.). An x-ray of Plaintiff's lumbar spine showed "generalized spondylosis, but no lysis, lysthesis, or fracture." (R. 487). The doctor diagnosed axial low back pain and sciatica. (*Id*.).

On that same day, Dr. Lavelle completed a Medical Source Statement indicating that Plaintiff was very limited in her ability to walk, stand, sit, push, pull, bend, lift, carry, and climb. (R. 538-39). Dr. Lavelle's exam notes indicate that he "filled out her jobs plus paperwork according to her statements," and that "for a true functional assessment she would likely require a functional capacity examination." (R. 487).

## 3. Dr. Sipple, Gastroenterologist

On December 19, 2013, Plaintiff saw gastroenterologist Dr. Michael Sipple for IBS, urgency to defecate after eating, and bloating. (R. 483). The doctor noted that Plaintiff had normal bloodwork as well as a normal upper gastrointestinal series and small bowel follow-through in 2010. (R. 483, 564). Dr. Sipple reported that Plaintiff had a normal gait and she was neurologically intact. (R. 485). He stated that Plaintiff had normal insight, memory, and judgment, and showed no evidence of depression, anxiety, or agitation. (*Id*.). The doctor

diagnosed IBS, abdominal distension/bloating, and diarrhea after meals and prescribed Levsin. (*Id*.).

On February 26, 2014, Plaintiff returned to Dr. Sipple's office where she saw PA Vincent LoCoco for a follow-up evaluation. (R. 500). She stated that Levsin did not really change her symptoms but noted that Immodium helped her IBS. (*Id*.). Plaintiff denied fatigue, malaise, weight gain, weight loss, abdominal pain, muscle weakness, joint pain, stiffness, migraines, anxiety, and depression. (R. 501). On examination, Plaintiff had normal neck range of motion and no edema. (*Id*.). The PA reported that Plaintiff had normal insight, judgment, and memory. (*Id*.). She showed no signs of depression, anxiety, or agitation. (*Id*.). Dr. Sipple prescribed Colestipol for Plaintiff's IBS symptoms. (*Id*.).

Plaintiff followed up with Dr. Sipple and PA LoCoco for her IBS on May 21, 2014. (R. 503). Plaintiff told Dr. Sipple that her symptoms had improved significantly since her last visit. (R. 520). Plaintiff denied weight gain, weight loss, diarrhea, stomach cramps, back pain, joint pain, muscle weakness, stiffness, migraines, frequent headaches, anxiety, and depression. (R. 521). Her physical and mental status examination findings were normal. (*Id*.). The doctor diagnosed diarrhea after meals and IBS. (*Id*.). The doctor advised Plaintiff to continue with Bentyl. (R. 503).

On the same day, PA LoCoco completed a Medical Source Statement for Plaintiff. (R. 529–34). PA LoCoco indicated that Plaintiff's symptoms were never severe enough to interfere with her attention and concentration. (R. 532). PA LoCoco opined that Plaintiff could sit eight hours in an eight-hour workday and stand/walk for eight hours in an eight-hour workday. (*Id*.). PA LoCoco indicated that Plaintiff did not need a job that permitted ready access to a restroom. (*Id*.)

7

Plaintiff saw Dr. Sipple and PA LoCoco for a reevaluation of her IBS on January 8, 2015. (R. 556–57). Plaintiff relayed that Colestid controlled her symptoms "quite nicely." (R. 556). She complained of stomach cramps but denied diarrhea. (R. 557). Plaintiff also denied any joint pain, muscle weakness, stiffness, migraines, anxiety, and depression. (*Id*.). Her physical and mental status examination findings were normal. (*Id*.). The providers advised Plaintiff to continue on Colestipol. (*Id*.).

Plaintiff saw Dr. Sipple and PA LoCoco for a follow-up visit on January 5, 2016. (R. 553–55). The doctor noted that Plaintiff's weight was stable, and Plaintiff reported good relief in her IBS symptoms with Colestipol. (R. 553). Plaintiff denied abdominal pain, diarrhea, or change in bowel habits. (R. 554). Plaintiff's physical examination findings were normal. (*Id*.). The doctor also noted that Plaintiff had normal judgment, insight, and memory. (*Id*.). She showed no evidence of depression, anxiety, or agitation. (*Id*.). The providers diagnosed IBS with diarrhea. (*Id*.).

### 4. Dr. Kenney, Internist

On January 16, 2015, internist Dr. Michael Kenney completed a Medical Source Statement for Plaintiff. (R. 542–43). Dr. Kenney opined that Plaintiff was very limited in her ability to walk, stand, sit, lift, carry, push, pull, bend, and climb stairs. (R. 543). He also opined that Plaintiff was very limited in her ability to understand and remember instructions; maintain attention/concentration; maintain basic standards of personal hygiene; and function in a work setting. (*Id*.). The doctor indicated that Plaintiff was moderately limited in her ability to carry out instructions; make simple decisions; and maintain socially appropriate behavior without exhibiting behavioral extremes. (*Id*.).

### 5. Dr. Ojugbeli, Internist

During a general physical exam on March 2, 2016, Internist Dr. Ifechukwude Ojugbeli reported that Plaintiff had an intact memory, normal attention, intact thoughts, intact judgment, normal insight, and clear speech.  (R. 575).  He also stated that Plaintiff had full strength throughout and she was neurologically intact.  (*Id*.).  PA Andrea Curtis advised Plaintiff to continue with her current medications and prescribed Amitriptyline for her insomnia.  (R. 578).  The doctor concluded that Plaintiff's fibromyalgia was "stable" and she was "[o]verall doing well."  (R. 577).

On March 1, 2016, Dr. Ojugbeli completed a Medical Source Statement for Plaintiff.  (R. 579–80).  He opined that Plaintiff was severely limited in her ability to walk, stand, sit, lift, carry, push, pull, bend, and climb stairs.  (R. 579).  The doctor also opined that Plaintiff had no limitations in her ability to follow, understand, and remember simple instructions and directions; interact with others and maintain socially appropriate behavior; and maintain basic standards of personal hygiene and grooming.  (*Id*.).  Dr. Ojugbeli also opined that Plaintiff was moderately limited in her ability to perform low stress, simple and complex tasks independently; maintain a schedule and attend to a daily routine; maintain attention and concentration for rote tasks and severely limited in her ability to function in a work setting.  (*Id*.).

In an undated/unsigned Medical Source Statement, Dr. Ojugbell opined that Plaintiff could sit for less than one hour in an eight-hour workday and stand/walk for less than one hour in an eight-hour workday.  (R. 591).  The doctor opined that Plaintiff could occasionally lift up to five pounds.  (*Id*.).  He also indicated that Plaintiff could occasionally grasp, turn, use hands/fingers for fine manipulation, and use arms for reaching.  (R. 592).  The doctor opined that Plaintiff's pain, fatigue, or other symptoms would frequently interfere with her attention and

concentration. (*Id.*). He estimated that Plaintiff would be absent from work more than three times a month. (R. 593).

### 6. Dr. Wnorowski

On July 1, 2014, Plaintiff saw orthopedist Dr. Daniel Wnorowski for right shoulder pain. (R. 513). Dr. Wnorowski reported that Plaintiff was fully oriented and in no acute distress. (R. 514). Her left shoulder showed intact sensation and no swelling, weakness, nor atrophy. (*Id.*). Plaintiff's left shoulder also had full range of motion and negative impingement signs. (*Id.*). Plaintiff's right shoulder showed abnormal mild motor strength (deficits), but no muscle atrophy and normal sensation. (*Id.*). Her right shoulder had no joint effusion, normal range of motion, and positive impingement signs. (R. 514–15). The doctor observed that Plaintiff had a normal gait. (R. 515). He also noted that Plaintiff had "normal motor power, normal sensation exam, and normal upper limb reflexes." (*Id.*). Her upper extremities also showed no muscle spasms, masses, or asymmetry. (*Id.*). An x-ray of Plaintiff's right shoulder showed no fractures, dislocations, or other significant abnormalities. (*Id.*). The doctor diagnosed right shoulder pain. (*Id.*).

On August 11, 2014, Plaintiff saw Dr. Wnorowski's orthopedic PA Thomas Van Arnam for right shoulder pain. (R. 535). Plaintiff stated that physical therapy had been helping her pain. (*Id.*). PA Van Arnam reported that Plaintiff's pain and range of motion had improved. (*Id.*). Plaintiff had normal strength, sensation, and range of motion of the left shoulder. (R. 536). Plaintiff complained of pain on range of motion testing of the right shoulder, but had no weakness, atrophy, nor decreased range of motion. (*Id.*).

### D. Consultative Examiners

#### 1. Dr. Lorensen, General Vascular Surgeon

On February 25, 2014, Plaintiff had a consultative internal examination with Dr. Elke Lorensen. (R. 493). Plaintiff denied using street drugs. (R. 494). She reported that she was unable to cook, clean, do laundry, or shop. (*Id.*). She indicated that she performed childcare on weekends, showered once a week, dressed herself twice a week, watched television, and read. (*Id.*). The doctor observed that Plaintiff had a normal gait, could rise from a chair without difficulty, and required no help changing for the examination. Plaintiff declined to heel and toe walk and squat. (*Id.*). She had full range of motion of the cervical spine and reduced lumbar spine range of motion. (R. 495). Her straight leg raising test was negative bilaterally. (*Id.*). Plaintiff had reduced bilateral shoulder range of motion, but full range of motion of the elbows, forearms, and wrists bilaterally. (*Id.*). She had reduced range of motion of the hips and knees bilaterally, but full range of motion of the ankles bilaterally. (*Id.*). Plaintiff had stable and nontender joints. (*Id.*). She was neurologically intact and had full strength in the upper and lower extremities. (R. 496). Plaintiff had intact hand and finger dexterity and full grip strength bilaterally. (R. 495). She had 14 fibromyalgia tender points. (*Id.*). Dr. Lorensen diagnosed back pain, fibromyalgia, IBS, and migraines. (*Id.*). The doctor opined that Plaintiff had no gross limitations in sitting, standing, walking, and handling small objects with his hands. (R. 496). He also opined that Plaintiff had moderate-to-marked restrictions in bending, lifting, and reaching. (*Id.*). An x-ray of Plaintiff's lumbar spine was normal. (R. 497).

#### 2. Dr. Shapiro, Psychologist

On February 25, 2014, Plaintiff had a consultative examination with psychologist Dr. Jeanne Shapiro. (R. 488–92). Plaintiff reported that she was currently unable to work due to a

learning disability, back problems, migraines, fibromyalgia, IBS, degenerative disc disease, herniated discs, and bad knees. (R. 488). Plaintiff endorsed feelings of uselessness, depression, forgetfulness, and sadness. (R. 489). She reported that she cared for her personal needs, prepared simple meals, performed light chores, shopped, read, watched television, spent time with her boyfriend, visited her children, managed her finances, and drove. (R. 491). She had intact attention, concentration, and memory. (*Id*.). The doctor noted that Plaintiff had fair insight and judgment. (*Id*.).

Dr. Shapiro opined that Plaintiff had no limitations in understanding and following simple instructions and directions and performing simple tasks. (R. 491). The doctor also opined that Plaintiff had mild limitations maintaining attention and concentration for tasks; attending to a routine and maintaining a schedule; and making appropriate decisions. (*Id*.). Dr. Shapiro concluded that Plaintiff had mild-to-moderate limitations performing complex tasks; learning new tasks; relating to and interacting well with others; and dealing with stress. (*Id*.). The doctor diagnosed Plaintiff with post-traumatic stress disorder (PTSD), "unspecified depressive disorder, rule out intellectual disability mild," migraines, back pain, fibromyalgia, degenerative disc disease, herniated discs, IBS, and history of traumatic brain injury. (R. 492).

### E. Vocational Assessments

#### 1. Dr. Kamin

On April 11, 2014, Dr. E. Kamin, a State agency medical consultant, reviewed the evidence of record and opined that Plaintiff had a mild restriction for activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (R. 233). Dr. Kamin opined that Plaintiff could perform simple-to-semi-skilled vocational activities. (R. 237).

Dr. Kamin concluded that Plaintiff was not disabled and demonstrated sufficient capability for light work. (R. 239).

## 2. Ms. DiTrinco

Vocational Expert ("VE") Christine DiTrinco testified at Plaintiff's April 11, 2016 administrative hearing. (R. 141). The ALJ posed the following hypothetical to the VE: (1) an individual possessing the same age, educational background, and past work experience as Plaintiff; (2) who can lift and carry 20 pounds occasionally and ten pounds frequently and lift, carry, push, and pull those amounts; (3) can frequently, but not continuously reach in all directions; (4) can occasionally squat; (5) can understand and follow simple instructions and directions; perform simple tasks independently; and maintain attention and concentration for simple tasks; (6) can regularly attend to a routine; maintain a schedule; and handle simple repetitive work-related stress involving occasional decisions directly related to the performance of simple tasks in a position with consistent job duties that does not require the individual to supervise or manage the work of others; and, (7) should avoid work requiring more complex interaction or joint effort to achieve work goals. (R. 146–47).

Ms. DiTrinco testified that the hypothetical individual could perform full-time work as a photocopying machine operator, of which there are 18,061 jobs nationally according to the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") and 66,530 jobs according to the Occupational Employment Statistics ("OES") survey; as a ticket taker, of which there are 24,987 jobs according to the DOT and 113,700 according to OES; and as a cleaner, housekeeper, of which there are 123,832 jobs according to the DOT and 929,540 jobs according to OES. (R. 147). Ms. DiTrinco also testified that a person unable to "complete an eight-hour day in any combination of sit/stand/walk" would have no full-time jobs available. (R. 148). She

acknowledged that no full-time jobs would be available to someone who is: (1) likely to be absent on an unexcused basis at least once a month; or (2) unable to sustain attention and concentration for more than 90 percent of the time on the job. (*Id*.).

### F. ALJ's Decision Denying Benefits

On April 26, 2016, the ALJ issued a decision denying Plaintiff's application for SSI benefits. (R. 10–21). At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since October 22, 2013, the application date. (R. 12).

At step two, the ALJ determined that, under 20 C.F.R. § 416.920(c), Plaintiff had two "severe" impairments: fibromyalgia and a mental impairment. (*Id*.). The ALJ found that "claimant's obesity, benign leukocytosis, lumbago, spondylosis, disc bulges, shoulder pain, migraines, irritable bowel syndrome, tooth problems, and insomnia are non-severe because the claimant has not demonstrated that they cause significant functional limitations." (R. 14).

At step three, the ALJ found that, while "severe," Plaintiff's mental and physical impairments failed to meet or medically equal the severity of any impairment listed in sections 12.04 (Depressive, Bipolar, and Related Disorders) or 12.06 (Anxiety and Obsessive-Compulsive Disorders). (R. 14). The ALJ noted that the Disability Determination Services ("DDS") expert found that Plaintiff had "only mild limitations in all areas and no episodes of decompensation." (*Id*.). Moreover, the ALJ found that Plaintiff had only mild restrictions in daily living activities and had no more than moderate difficulties in social functioning. (R. 14–15). The ALJ noted that Plaintiff reported to the consultative examiner that she was able to dress, bathe, groom, cook simple food, perform limited cleaning, and manage her finances. (*Id*.). The ALJ found that Plaintiff reported living with family and having a boyfriend that

14

assisted with household tasks.  (R. 15).  Plaintiff was found to "not have difficulty interacting with medical staff and is generally cooperative during exams."  (*Id*.).  The ALJ concluded that clinical findings "did not indicate that the claimant exhibits any on-going difficulties with attention, concentration, or memory."  (*Id*.).  The ALJ noted that Plaintiff "has not demonstrated that she experiences repeated episodes of decompensation, each of extended duration," and further that she "has not demonstrated that she has a complete inability to function independently outside the area of her home."  (*Id*.).

At step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC") and found that Plaintiff would be able to: lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; frequently but not continuously reach in all directions; occasionally squat; and had no other exertional limitations.  (R. 16).  In addition, the ALJ found that "[t]he claimant retains the ability to understand and follow simple instructions and directions; perform simple tasks independently; maintain attention and concentration for simple tasks; regularly attend to a routine and maintain a schedule; handle simple, repetitive work-related stress in that the claimant can make occasional decisions directly related to the performance of simple tasks in a position with consistent job duties that does not require the claimant to supervise or manage the work of others; and should avoid work requiring more complex interaction or joint effort to achieve work goals."  (R. 16).  In making this RFC determination, the ALJ considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. §§ 416.927, 929 and Social Security Rulings 96-4p, 96-2p, 96-5p, 96-6p and 06-3p.  (*Id*.).

In considering Plaintiff's symptoms, the ALJ adhered to a set two-step process: first, she determined whether there was an underlying medically determinable physical or mental

15

impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms; and second, after finding such impairments, she evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limited her ability to do basic work activities. (*Id.*). Applying this two-step process, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms, but that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 16–17).

The ALJ acknowledged that Plaintiff reported symptoms including: chronic pain in her neck and shoulder, chronic fatigue, back spasms, poor balance, more than 300 migraines a year, diarrhea that causes her to be in the bathroom twice a day for 30 minutes at a time, anxiety, and depression. (*Id.*). Plaintiff alleged that these symptoms "limit her ability to perform activities of daily living, including reaching, doing dishes, and playing games." (*Id.*). The ALJ found that Plaintiff's reported symptoms were "inconsistent with the majority of her medical records," which indicated that her symptoms were generally well managed and often improved with conservative care. (R. 17). The ALJ noted that "[w]ith respect to the claimant's anxiety and depression, treatment records show that the claimant is diagnosed with anxiety and depression but does not exhibit mood abnormalities during most exams. [Claimant] has not pursued specialized mental health treatment." (*Id.*).

In establishing Plaintiff's RFC, the ALJ gave "great weight" to the opinions of Dr. Sipple and PA LoCoco, Dr. Lorensen, Dr. Shapiro, and Dr. Kamin. (R. 18). The ALJ reasoned that their conclusion that Plaintiff had minimal to moderate restrictions to perform simple, light work was generally consistent with the medical evidence. (*Id.*). The ALJ found that Plaintiff

had "generally normal physical signs during exams with [ ] providers, and reported improvement in physical symptoms with minimal treatment." (*Id*.). The ALJ noted that in "finding that the claimant is limited to simple work without complex social interaction," she had "accounted for any limitations the Plaintiff had in performing complex tasks, learning new tasks, relating to others, and dealing with stress." (*Id*.).

Conversely, the ALJ gave "little weight" to the opinions of Dr. Lavelle, Dr. Michaels, and Dr. Kenney, on the basis that their finding that the claimant was unable to perform sedentary work "is inconsistent with the claimant's generally normal physical exams, positive response to conservative treatment, [ ] and [Plaintiff's ability to] perform some household chores." (R. 18–19). The ALJ accorded "little weight" to Dr. Objugbeli's opinion that the "claimant is moderate to severely limited in most areas of physical and mental functioning," because it is "inconsistent with his own treatment note which indicates that the claimant denied having musculoskeletal, gastrointestinal, neurological, and psychiatric symptoms and exhibited alertness, no distress, normal ambulation, no musculoskeletal tenderness, no sensory or strength deficits, and a normal mood/affect." (R. 19). Dr. Objugbeli wrote that Plaintiff was "[o]verall doing well," and that her fibromyalgia was "[s]table." (*Id*.).

Finally, at step five, having determined Plaintiff's limitations, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 20). Specifically, the ALJ refers to testimony from VE Christine DiTrinco, who concluded that given all of the relevant factors, Plaintiff would be able to perform the requirements for such occupations as photocopying machine operator, ticket taker, and cleaner/housekeeping. (*Id*.). Based on VE DiTrinco's testimony, the ALJ found that Plaintiff

17

"was capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (*Id*.).

Therefore, the ALJ ultimately found that Plaintiff was not disabled under Section 1614(a)(3)(A) of the Act. (R. 21).

### G. Additional Evidence Submitted to the Appeals Council

Plaintiff submitted three pieces of medical evidence to the Appeals Council that were issued after the ALJ's decision in April 2016, specifically: (1) two MRIs of Plaintiff's lumbar spine and cervical spine from September 2016; (2) an unsigned and undated impairment questionnaire from Dr. Ojugbeli; and (3) a neuropsychological evaluation by neurologist Dr. Theresa Covington diagnosing Plaintiff with autistic disorder, mild cognitive impairment, and attention-deficit disorder. (R. 585–610).

The 2016 MRI study showed mild degenerative disc disease at the L2-3, L3-4, and L4-5 disc levels without evidence of disc herniation or spinal canal narrowing and no other significant findings. (R. 585). The MRI of Plaintiff's cervical spine showed mild degenerative disc disease at C5-6 and C6-7 with minimal broad-based posterior disc bulge at both levels only slightly narrowing the spinal canal; moderate bilateral degenerative neuroforaminal narrowing at C5-6; and no other significant findings. (R. 587).

The unsigned and undated impairment questionnaire from Dr. Ojugbeli indicates that Plaintiff suffered from chronic low back pain which could be aggravated by walking, sitting, or standing for long periods. (R. 589–90). The questionnaire opines that Plaintiff suffered from significant physical limitations and would be unable to perform work-related demands in an 8-hour work day. (R. 591–93).

The neuropsychological evaluation showed that from October 2016 through January 2017 Plaintiff saw neuropsychologist Dr. Covington for examination, testing, and diagnosis. (R. 594–610). On examination, Dr. Covington reported that Plaintiff was alert and fully oriented. (R. 595). Plaintiff was cooperative and had goal-directed and tangential thought processes. (R. 596). On the Wechsler Adult Intelligence Scale-IV ("WAIS-IV"), Plaintiff received scored in the low average-to-superior range. (R. 596–99). On additional intellectual testing, Plaintiff scored within the impaired-to-very superior range for verbal memory, logical memory, visual memory, motor and sensory, and verbal reasoning. (R. 599–601). Dr. Covington diagnosed autistic disorder, post-concussive disorder, mild cognitive impairment, "Attention-deficit disorder, combined type," and "major depressive disorder, recurrent, mild." (R. 609–10).

The Appeals Council reviewed this additional medical evidence in Plaintiff's appeal but ultimately denied Plaintiff's request for further review. (R. 1–5).

## III. DISCUSSION

### A. Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner must use a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); 20 C.F.R. § 416.920. The claimant has the initial burden of establishing disability at the first four steps. However, if the claimant establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B. Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033,

1038 (2d Cir. 1983)). The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard. 42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151; *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court may reject the facts that the ALJ found "only if a reasonable factfinder would have to conclude otherwise." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).

### C. Analysis

Given Plaintiff's *pro se* status, the Court will liberally construe her papers to raise the strongest arguments they suggest. *See Rose v. Comm'r. of Soc. Sec.*, 202 F. Supp. 3d 231, 239 (E.D.N.Y. 2016); *see also McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). In general, Plaintiff argues that the ALJ's decision is not supported by substantial evidence as it failed to consider the full scope of Plaintiff's medical ailments, and otherwise included inaccurate information relating to Plaintiff's medical history and lifestyle. (Dkt. No. 15). Specifically, Plaintiff contends that: (1) the ALJ failed to properly evaluate the severity of Plaintiff's impairments caused by her irritable bowel syndrome and insomnia; (2) the ALJ's RFC assessment is not supported by substantial evidence;

(3) the ALJ's evaluation did not consider Plaintiff's autism diagnosis, which was dated after the ALJ's final decision; and (4) new evidence further shows that she is disabled. (*Id*.). Therefore, Plaintiff argues that the ALJ's decision should be reversed, with a finding that Plaintiff is disabled. (*Id*., pp. 11–16).

## 1. Substantial Evidence Supports the ALJ's Severity Determinations

Plaintiff alleges that she suffers from autism, attention deficit hyperactivity disorder, depression, anxiety, IBS-D, chronic pain, fibromyalgia, two herniated discs, sciatic nerve problems, lumbago, benign leukocytosis, migraines, degenerative disc disease, tooth problems, insomnia, and a learning disability. (Dkt. No. 15; R. 341–51, 374).

At step two of the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment that significantly limits his or her physical or mental ability to do basic work activities. 20 C.F.R. § 416.920(c). The claimant bears the burden of presenting evidence establishing severity. *Taylor v. Astrue*, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012). Although the Second Circuit has held that this step is limited to "screen out de minimis claims," *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995), the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, by itself, sufficient to render a condition "severe." *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995). Indeed, a "finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Bowen v. Yuckert*, 482 U.S. 137, 154 n.12 (1987). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Taylor*, 32 F. Supp. 3d at 263 (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982)).

22

The ALJ found that Plaintiff suffered from a severe fibromyalgia impairment and a severe mental impairment, along with other non-severe impairments. After careful review of the record, the Court concludes that these findings are supported by substantial evidence. The Court will address each relevant finding in turn.

### a. Severe Fibromyalgia and Mental Impairment

Plaintiff's primary medical complaint is fibromyalgia and generalized chronic pain. (Dkt. No. 15, pp. 8–10). According to Plaintiff's papers, "[she] suffer[s] through pain every day and nothing makes it better, everything [she] do[es] makes it worse. [Her] pain level is always 9–10 on the scale." (*Id*., p. 9). The ALJ determined that Plaintiff had a history of fibromyalgia which could be considered severe because it more than minimally limited Plaintiff's ability to perform basic work activities. (R. 13). Specifically, the ALJ found that "treatment records show that the claimant's primary care providers have diagnosed claimant with fibromyalgia and that claimant reports ongoing pain associated with this condition." (*Id*.). The ALJ "considered all of [Plaintiff's] pain complaints, including any related to her back, under her fibromyalgia diagnosis by finding that to be a severe impairment." (*Id*.).

Next, the ALJ found that Plaintiff's reports of experiencing anxiety and depression were sufficient to support a finding of severe mental impairment. (R. 13). The ALJ noted that "[d]uring any given encounter, mental health professionals have given the claimant various diagnoses and characterized her mental impairment in various ways (e.g. post-traumatic stress disorder, depressive disorder) . . . . By finding the claimant to have a 'severe' mental impairment however characterized, all symptoms affecting her mental functioning have been considered." (*Id*.). Plaintiff states that she has suffered from depression and anxiety since she was a child, and further asserts that her autism and ADHD prevent her from getting a higher

23

education.  (Dkt. No. 15, pp. 2–6).  The ALJ noted that "all symptoms affecting her mental functioning have been considered" in her determination that Plaintiff suffered from severe mental impairment.  (R. 13).

Upon review of the record, the Court finds that substantial evidence supports the ALJ's determination that Plaintiff's fibromyalgia/chronic pain and mental impairments were severe.

### b. Non-Severe Irritable Bowel Syndrome with Diarrhea ("IBS-D")

Plaintiff's papers appear to suggest that the ALJ should have found her IBS-D to be a severe impairment, explaining that "it makes it hard for her to go anywhere because [she] need[s] to be near a bathroom all the time . . . ."  (Dkt. No. 15, p. 6).  Plaintiff further reported getting diarrhea every time she ate and anytime she had pressure on her stomach from pants and underwear.  (*Id*., p. 6–7).  She stated that: "I never know when it's going to happen so I just stay home so I don't have to know where a bathroom is."  (*Id*., p. 8).  Plaintiff stated that each onset of diarrhea required her to be in the bathroom for 30 minutes each time.  (R. 40).

The ALJ found that Plaintiff's irritable bowel syndrome did not present a severe impairment under the Act because Plaintiff "has not demonstrated that [it] caused significant functional limitations."  (R. 13).  Specifically, the ALJ found that "[h]er gastroenterological workup, including an upper GI and small bowel series, was negative (2010) and follow-up treatment records indicate that her intestinal problems are controlled with medication."  (R. 17).

The record shows that Plaintiff was treated on numerous occasions by gastroenterologist Dr. Sipple and PA LoCoco, who diagnosed Plaintiff with IBS and diarrhea after meals.  (R. 483–85, 500–04, 520–28).  Plaintiff reported that Immodium and Colestipol resulted in significant improvements in symptoms.  (*See id*.).  Plaintiff later reported no gastrointestinal symptoms during a general physical examination on March 1, 2016 with internist Dr. Ojugbeli.

(R. 574–75).  Plaintiff's assertions that her IBS symptoms had not improved is unsupported by the medical evidence in the record, which indicates that Plaintiff's symptoms showed improvement with conservative treatment.

Accordingly, the ALJ's finding that Plaintiff's gastrointestinal issues were non-severe and did not pose any significant functional limitation is supported by substantial evidence.

### c.  Non-Severe Insomnia

Plaintiff's papers also suggest that her insomnia should have been considered a severe impairment, explaining that she has difficulty falling asleep because of chronic pain and an inability to "stop thinking about all [her] problems."  (Dkt. No. 15, 10–11).  She states that she is only able to "sleep about 2–4 hours a night and it makes [her] tired all the time."  (*Id.*, p. 11).  Aside from general tiredness, Plaintiff does not claim that her insomnia causes any significant functional limitation that would prevent her from basic work functions.

The ALJ found Plaintiff's insomnia was not a severe impairment because "the claimant has not demonstrated that they cause significant functional limitations."  (R. 13).  Plaintiff reported insomnia and difficulty sleeping to numerous medical professionals.  (*See e.g.* R. 489, 501, 521, 546, 605).  The record shows that Plaintiff's insomnia was treated with medication by Drs. Michaels (Ambien) and Ojugbeli (Amitriptyline).  (R. 469, 578).  Accordingly, the ALJ's conclusion that Plaintiff's insomnia diagnosis did not cause any significant functional limitation is supported by substantial evidence.

Moreover, the ALJ's decision appears to have accounted for Plaintiff's insomnia diagnosis within the determination that Plaintiff suffered from a severe mental impairment.  (R. 13, stating that "[b]y finding the claimant to have a 'severe' mental impairment however characterized, all symptoms affecting her mental functioning have been considered.").

25

## 2.  The ALJ's RFC Assessment Is Supported by Substantial Evidence

The regulations define residual functional capacity as "the most [a claimant] can still do despite" her limitations.  20 C.F.R. § 416.945(a)(1).  The ALJ must assess "the nature and extent of [a claimant's] physical limitations and then determine . . . residual functional capacity for work activity on a regular and continuing basis."  20 C.F.R. § 416.945(b).  The regulations further state that "[a] limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work."  *Id*.

Here, the ALJ found that Plaintiff had "the residual functional capacity to lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently, frequently but not continuously reach in all directions, occasionally squat, and has no other exertional limitations."  (R. 16).  However, Plaintiff claims this was an error, stating that "I do have difficulty geting [sic] up, with sitting, bending, standing, walking, and carrying, lifting, and pushing."  (Dkt. No. 15, p. 15).  She further states that "[e]verytime I walk more than an hour a day and that includes walking around the house, sit more than 30 minutes a day, stand more than 20–30 minutes a day, and push, pull and carry more than 5lbs a day my back gives out and get a spasm and then I need help for the next two weeks before it release the pain and pressure."  (*Id*., p. 10).  Therefore, Plaintiff appears to argue that the ALJ's RFC is erroneous and not supported by substantial evidence.

In reaching the RFC assessment, the ALJ gave great weight to Dr. Lorensen, who found that Plaintiff had no gross limitations in sitting, standing, walking, and handling small objects

with her hands. (R. 496). He also opined that Plaintiff had moderate-to-marked restrictions in bending, lifting, and reaching. (*Id.*). The ALJ reasoned that Dr. Lorensen's findings were:

> consistent with the claimant's report of chronic pain, demonstrated fibromyalgia tender points and reduced range of motion of her back and shoulders during her consultative examination, generally normal physical signs during exams with other providers, and reported improvement in physical symptoms with minimal treatment. It is also consistent with the claimant's medical imaging showing that the claimant has mild degenerative changes to her lumbar spine.

The ALJ similarly afforded great weight to PA LoCoco, who specialized in gastroenterology and treated the Plaintiff on several occasions. (R. 18, citing 20 C.F.R. § 416.913). PA LoCoco concluded that Plaintiff had no limitations to sitting, standing and walking, and was capable of moderate stress. (R. 532). The ALJ reasoned that PA LoCoco's conclusions were "consistent with the claimant's generally normal physical and mental examinations and reported improvement in her intestinal symptoms with medications." (R. 18).

With regard to Plaintiff's mental impairments, the ALJ found that Plaintiff retains "the ability to understand and follow simple instructions and directions; perform simple tasks independently; maintain attention and concentration for simple tasks; regularly attend to a routine and maintain a schedule; handle simple, repetitive workrelated stress in that the claimant can make occasional decisions directly related to the performance of simple tasks in a position with consistent job duties that does not require the claimant to supervise or manage the work of others; and should avoid work requiring more complex interaction or joint effort to achieve work goals." (R. 16). In making this assessment, the ALJ afforded great weight to the Dr. Kamin, who determined that Plaintiff was not disabled and was capable of performing light work. (R. 18, 239). The ALJ found that this was consistent with Plaintiff's general presentation

27

at medical appointments, as well as "her normal mental status exams, conservative treatment history, and her reported ability to perform some household chores, manage money, and socialize with others." (R. 18). The ALJ also found Dr. Kamin's conclusion consistent with Dr. Shapiro's opinion that Plaintiff had: (1) no limitations understanding and following simple instructions and directions; (2) no limitation performing simple tasks; (3) only mild-moderate limitation performing complex tasks; (4) mild limitations maintaining attention and concentration for tasks; and (5) a mild to moderate limitation to deal with stress. (R. 491).

By contrast, the ALJ assigned little weight to the opinions of Dr. Lavelle, Dr. Michaels, and Dr. Kenney, who found that the Plaintiff was unable to perform sedentary work. (*Id.*). The ALJ reasoned that their conclusions were "inconsistent with claimant's generally normal physical exams; positive response to conservative treatment, including physical therapy; and statements that she walks for exercise and can perform some household chores." (R. 18–19). Similarly, the ALJ assigned little weight to Dr. Ojugbeli's conclusion that Plaintiff was moderately to severely limited in most areas of physical and mental functioning, as it was "inconsistent with his own treatment note which indicates that the claimant denied having musculoskeletal, gastrointestinal, neurological, and psychiatric symptoms and exhibited alertness, no distress, normal ambulation, no musculoskeletal tenderness, no sensory or strength deficits, and a normal mood/affect." (R. 19). Thus, the ALJ gave good reasons for assigning little weight to these opinions, which were largely inconsistent with the record evidence. *See Burgess v. Astrue*, 537 F.3d 117, 130 (2d Cir. 2008); *see also Calef ex rel. Calef v. Barnhart*, 309 F. Supp. 2d 425, 430 (E.D.N.Y. 2004) (stating that "in evaluating the evidence, the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have

reached a different result upon *de novo* review.") (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991))).

Additionally, the ALJ found that Plaintiff's allegations of functional limitations were not entirely credible to the extent alleged and were otherwise inconsistent with other evidence in the record. (R. 17, stating that "claimant's report of symptoms is inconsistent with the majority of her medical records."). Specifically, the ALJ noted that:

> the claimant reports having chronic pain, fatigue, back spasms, poor balance, frequent migraines and regular bouts of diarrhea, however, the majority of treatment records indicate that she does not exhibit distress, fatigue, back spasms, coordination difficulties, or intestinal problems during exams. The only time she exhibited fibromyalgia tender points was during her consultative examination . . . . Moreover, her primary care provider, Dr. Ojugbell, notes that the claimant's fibromyalgia is 'stable.' In addition, x-rays of her lumbar spine have shown, at most, very mild disc space narrowing. X-rays of her right shoulder performed in July 2014 reportedly indicated that she had 'pain/dysfunction' but no other abnormalities.

The ALJ's RFC assessments closely track the findings of evaluating professionals to whom the ALJ assigned great weight. (R. 18). Therefore, after careful review of Plaintiff's arguments and the administrative record, the Court finds that the ALJ's RFC determination was set forth with sufficient specificity and supported by substantial evidence in the record. *See Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67 (N.D.N.Y. 2005) (holding that an ALJ's RFC determination was supported by substantial evidence where it was consistent with objective medical evidence and physicians' findings); *Banks v. Astrue*, 955 F. Supp. 2d 178, 187–88 (W.D.N.Y. 2013) (upholding ALJ's RFC determination where conclusions were supported by findings of medical professionals); *Schlichting v. Astrue*, 11 F. Supp. 3d 190, 208 (N.D.N.Y. 2012) ("the ALJ's overall RFC assessment is supported by substantial evidence . . . including

the consultative examiner's report."); *Sloan v. Colvin*, 24 F. Supp. 3d 315, 324–26 (W.D.N.Y. 2014) (upholding an ALJ's RFC assessment where it was supported by substantial medical evidence in the record, including the opinions of consultative physician and a state agency psychological consultant).

### 3. Plaintiff's Allegation of Factual Errors

Plaintiff also alleges that the ALJ made several erroneous findings of fact. (Dkt. No. 15, pp. 11–16). Specifically, Plaintiff claims that: (1) she did not report that she saw a rheumatologist prior to April 2018; (2) she did not report seeing an orthopedic specialist since 2009; (3) she did not report that she could do certain household chores without assistance from others; (4) she did not report being able to walk more than an hour a day total; (5) she never worked at some of the jobs identified in her work history; and (6) the vocational expert was not properly informed of all of Plaintiff's medical problems. (*Id.*).

When evaluating Social Security claims, courts may deem an error harmless where the ALJ would have reached the same result regardless. *See McIntyre v. Colvin*, 758 F.3d 146, 148 (2d Cir. 2014) (applying harmless error analysis where the ALJ posed an incomplete hypothetical to the vocational expert, but otherwise sufficiently accounted for the claimant's particular limitations); *Melendez v. Astrue*, 630 F. Supp. 2d 308, 317 (S.D.N.Y. 2009) (declining to remand where ALJ's factual errors were harmless because "the verity of [the disputed] facts would not attenuate the [ALJ's] conclusion"); *see also Molina v. Astrue*, 674 F. 3d 1104, 1115 (9th Cir. 2012).

First, the Court finds that any or all the alleged factual errors, regardless of their accuracy, would not provide sufficient basis to overturn the ALJ's decision. Nevertheless, contrary to Plaintiff's assertions, the record indicates the following: (1) Dr. Michael's notes from

2012 indicate that Plaintiff's fibromyalgia was being followed by a rheumatologist (*see e.g.* R. 464, 467, 469); (2) medical records indicate that Plaintiff met with orthopedist Dr. Lavelle in December 2013 (*see e.g.* R. 486–87); (3) numerous treating professionals noted that Plaintiff reported being able to do at least some light housework (*see e.g.* R. 491); (4) numerous treating professionals, including Dr. Lorensen, Dr. Sipple and PA LoCoco, determined that Plaintiff had only minimal limitations with regard to walking, sitting, standing, etc. (*see e.g.* R. 493, 496, 532); (5) the record shows that Plaintiff had no relevant work history and had not worked since 2003; and (6) the Vocational Expert was properly asked to evaluate the occupational prospects for a 39-year-old individual with Plaintiff's RFC, a high school education, and no past relevant work experience (*see e.g.* R. 46). Therefore, the errors alleged by Plaintiff are belied by the record, and even if Plaintiff disagrees with the ALJ's findings of fact, they are nonetheless supported by substantial evidence in the record. Moreover, the alleged factual errors, if any, were harmless since the ALJ would have reached the same result absent the errors.

### 4. Plaintiff's Autism Diagnosis and New Evidence

Plaintiff presented three pieces of additional medical evidence to the Appeals Council that were not available to the ALJ. (R. 4). The additional materials included: (1) two MRIs of Plaintiff's lumbar spine and cervical spine; (2) an unsigned and undated impairment questionnaire from Dr. Ojugbeli; and (3) a neuropsychological evaluation report by neurologist Dr. Theresa Covington diagnosing Plaintiff with autistic disorder, mild cognitive impairment, and attention-deficit disorder. (R. 585–610). Plaintiff claims that the report from Dr. Covington provides new evidence "to prove that my learning disability [ ] makes it hard to do any job." (Dkt. No. 15, p. 12). Plaintiff asserts that the results show that she suffered from these problems before 2013, and that she had previously not been given the "right test." (*Id*.). The Government

31

responds that these materials are duplicative of other record evidence already considered by the ALJ and that the new evidence does not require remand nor suggest another result was proper. (Dkt. No. 19, pp. 26–27).

The Second Circuit has held that a court may remand a case to the Commissioner to consider additional evidence, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Jones v. Sullivan*, 949 F. 2d 57, 60 (2d Cir. 1991). Specifically, the proponent of new evidence must satisfy three separate prongs: (1) that the evidence must be new and not merely cumulative; (2) that the evidence is material, meaning both that it is relevant to plaintiff's condition during the time period for which benefits were denied, and presents a reasonable possibility that the new evidence would have influenced the ALJ to decide claimant's application differently had it been presented earlier; and (3) that there is good cause for not having presented the evidence earlier. *Id*. (citing *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988)).

Here, the Court finds that the MRIs, both from September 2016, do not satisfy the first or second prongs of the new evidence test because the MRIs are merely cumulative and confirm previous radiological findings considered by the ALJ. Specifically, the 2016 MRIs show "[m]ild degenerative disc disease . . . [and] no disc bulge or herniation," which is consistent with previous radiological findings in the record that found "normal alignment" and "[v]ery mild disc space narrowing." (*Compare* R. 466, *with* R. 585–88). Therefore, this evidence is not sufficiently new or material to warrant remand and reconsideration of Plaintiff's claim.

Similarly, Dr. Ojugbeli's unsigned and undated questionnaire, (R. 589–93), fails both the first and second prongs because the ALJ had previously considered other record evidence

reflecting Dr. Ojugbeli's conclusion that Plaintiff suffered from functional limitations. (R. 19; *see also* R. 571–80). The ALJ assigned little weight to Dr. Ojugbeli's conclusions, finding that they were inconsistent with the medical record and were also internally inconsistent with his own notes that Plaintiff indicated normal ambulation, no musculoskeletal symptoms or tenderness, and no sensory or strength deficits. (*Id*.). Therefore, Dr. Ojugbeli's questionnaire is cumulative of other record evidence, and does not present any new material evidence or medical opinions that had not previously been considered.

Finally, Dr. Covington's neuropsychological evaluation report is new evidence that was not available before the ALJ decision was issued in April 2016. (R. 594–610). However, the Court finds that the evidence fails the first and second prong as it is cumulative of evidence already considered by the ALJ and does not present sufficient basis upon which the ALJ was reasonably likely to have decided Plaintiff's application differently. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (holding that remand is not necessary where the same result would have been achieved).

Notably, the mental impairments associated with Dr. Covington's diagnosis of autism disorder, mild cognitive impairment, and attention-deficit disorder were already included and considered within the ALJ's RFC determination. (R. 13, 17–19). The record shows that the ALJ had already determined that Plaintiff suffered from "severe mental impairment." (R. 13). The ALJ's decision states that "[i]n determining whether an individual is disabled, what the impairment is called is of no real consequence; rather how a given impairment affects mental functioning is the central inquiry under the Act." (*Id*.). Thus, in finding that Plaintiff had a severe mental impairment, "all symptoms affecting her mental functioning [were] considered." (*Id*.). The record is replete with evidence that the ALJ fully considered Plaintiff's mental

33

limitations, including Dr. Shapiro's findings that Plaintiff had limitations in performing complex tasks, relating with others, and dealing with stress. (R. 18). Because Dr. Covington's observations and conclusions are significantly aligned with other record evidence previously considered by the ALJ, including Dr. Shapiro's findings, Dr. Covington's report is not a basis for remand. *See Patterson v. Colvin*, 24 F. Supp. 3d 356, 372–74 (S.D.N.Y. 2014) (rejecting remand where new medical evidence was not probative because "there was no reasonable possibility that the ALJ would have decided [claimant's] claims differently").

The Court also notes that each of these additional pieces of evidence were reviewed by the Appeals Council, which, upon consideration of these new reports and the full record, denied Plaintiff's request for review. (R. 1–5); *see also Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996) (reasoning that "when the Appeals Council denies review after considering new evidence, the Secretary's final decision 'necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence").

Accordingly, the Court finds that Plaintiff's newly proffered evidence is merely cumulative of evidence previously considered by the ALJ, and therefore, is not reasonably likely to change the outcome on remand. *See DiBlasi v. Comm'r of Soc. Sec.*, 660 F. Supp. 2d 401, 406–07 (N.D.N.Y. 2009) (holding that remand was not warranted where "purported new evidence was merely cumulative of that already in the record"); *see also Henderson v. Berryhill*, No. 16-cv-794L, 2018 U.S. Dist. LEXIS 213788, at *11–16, 2018 WL 6629301, at *4–5 (W.D.N.Y. Dec. 19, 2018) (holding that remand for consideration of new evidence was not warranted where claimant failed to show that new evidence was likely to have influenced the ALJ's decision regarding her applications), *appeal docketed*, No. 19-232 (2d Cir. Jan 24, 2019).

## IV.    CONCLUSION

Although the Court recognizes that Plaintiff suffers from several serious ailments, it is not for the Court to overturn the ALJ's decision if that decision is supported by substantial evidence in the record.  Indeed, even "[w]here there is substantial evidence to support either position, the determination is one to be made by the factfinder."  *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990).  After careful review of the record, the Court concludes that the ALJ applied the correct legal standards and the decision is supported by substantial evidence.

For the foregoing reasons it is

**ORDERED** that the decision of the Acting Commissioner is **AFFIRMED**; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case and provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

Date:    January 30, 2019
　　　　Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge